I am pleased to quote Richard Monkman for the non-profit organization Family Centered Services of Alaska, which operates family homes for troubled youth in Fairbanks, Alaska. The issue presented here is whether family centers, family homes, which house between three and five children with a married couple serving as house parents, are institutions for engaging in the care of the mentally ill, and thus covered by the Fair Labor Standards Act, requiring payment of hourly wages and overtime for the house parents' services. The house parents who are paying this in this case all signed contracts, letter agreements to be paid on a salary basis, receiving compensation estimated about a total package of about $125,000 a year. For resigning in family homes... Is that $125,000 including some sort of value for the right to occupy the home? Yes, Your Honor. The salaries themselves range roughly between $70,000 and $90,000, plus use of a vehicle, the homes, rent free of charge, utilities paid. But there's a computation. To get to the $125,000, you compute the rent. Is that...? Yes, Your Honor. And that's in, I believe, it's Kenan's affidavit on the record. The vehicle, groceries. Much of the salary issue is separate, but I have to say it struck me as well, because we have the calculation that you just offered and is offered in your brief, and we have an answering brief that talks about the plans being paid below minimum wage. What am I missing here? I mean, it's hard for me to understand how $125,000 can be accurate and below minimum wage can be accurate. One of those probably has to give. What's your take on this? Well, Your Honor, it depends on, in little part, on how you look at the number of hours worked per week. The salary agreement was for estimating that you would have one full-time parent working somewhere in the neighborhood of 40 hours a week and one part-time parent working 18 hours a week. But it was recognized at the outset that those are approximations. In fact, this is a situation where hours worked are very difficult to determine. You can put down 18 hours a day. I am a parent. My younger just graduated from high school, so I won't be the same kind of parent in the future, but somehow 40 hours a week, you probably don't get off at 40 hours a week. You can't stop running the clock. Is that the source of the problem? I think that's part of the source of the problem. This is not a lockdown or confinement kind of institution. This is a family home. The children who live there go to school, do their activities. They are living essentially normal daily lives. The house parents are there serving just as parents do when the children are at school. The part-time parent is free to take other employment if they want. They're either at the house or not at the house, but as all parents know, you're not fully engaged with the children 24 hours a day. There are times where they say life is short, but the days are long. They come into all parenting duties, but essentially these are a married couple acting in loco parentis for three children, four children, five children. The cases recognize that the actual hours worked are difficult to determine. The Kitchens case in particular, which is factually very close to our situation, gets into that a little bit. In this situation, if you calculate as my friend Mr. Cordell does, that the parents are working 18 or 24 hours a day, then that $90,000 becomes a very small hourly figure. If you are figuring that the parents are working when they're getting the kids off in the morning, when the kids come home from school before they go to activities, or in the evenings as they're making sure they're doing their homework and getting to bed, well, the hourly figure may go up quite a bit. So it's not a situation which is conducive to shift work. It's not a work environment which is conducive to measuring time spent by the hour, and for that reason when our clients engaged our parents, they engaged them on a salary basis, and they did sign letter agreements on that basis. Now the outcome of labor law, which has a major impact on our client, is whether or not these houses or institutions are primarily engaged in the care of the mentally ill. Well, that's not really just a fine point. It's a question of statutory interpretation. Yes, Your Honor. And when you look at the plain meaning of the word institution for mentally ill, it's the first step in the statutory interpretation. But before you get to that, the same language appears in two different sections. Does it matter in terms of this case? For example, I'm looking at R1, or rather R2A, and I'm also looking at S1B. I don't believe which one we're talking about. The district court focused on subsection R, Your Honor, but I don't believe it makes much difference. At least we haven't been able to determine a distinguishing difference there. But the statutory language that is crucial is institution primarily engaged in the care of the sick, the aged, the mentally ill, or defective who reside on the premises of such institution. Does that make sense? Exactly, Your Honor. And that's part of the entire sub-A of R2. Yes, Your Honor. And, you know, we believe and have argued that these family homes are simply not institutions under the plain meaning of the word. A mental institution is a fairly well, easily understood term, an institution for the care of the mentally ill. We cite in our brief many references in judicial opinions to mental institutions, asylums, institutions for the care of the mentally ill. And when we look at congressional intent, also what you see is the 1966 amendments a concern for large institutions, hospitals, institutions, schools, which are in competition with economic competition with private for-profit enterprise, where shift workers, as the state of Alaska points out in their amicus brief, where shift work is the norm, where shift work is required because you're caring for a large number of people who need constant care 24 hours a day. Before you get to legislative history or legislative intent, I look at the words that are in the same passage, and I see hospital, school for mentally or physically handicapped, a preschool, an elementary or secondary school, or an institution of higher education. Should we take into consideration the words that surround the clause that we're concerned with? Well, yes, Your Honor, of course you should, in the sense of reading the statute as a whole. The key words that I think have been at issue, at least to date in this case, are the sick, mentally ill, or defective, I think is the phrase, as relating to institution. But the real question, you've got a threshold question, is this an institution or not? Even before you get to what kind of institution, is it an institution? And I'm asking you the question, and I'll ask the same question to opposing counsel. Is a home for four to five children managed by a husband or wife, is that like a hospital, a school for mentally or physically handicapped or gifted children, an institution of higher education, et cetera? Absolutely not, Your Honor, is our position. We do not see this as an institution at all. It is a very, very small group, one similar to a foster home, but it's a family home. It is there to provide a place for disturbed, troubled, abandoned, neglected children to work out their problems, but it's not an institution. In fact, as I think the amicus briefs point out, particularly the Mental Health Trust brief, this is a model which is designed to avoid putting children into institutions. It's meant to give children who have dysfunctional family situations, who have problems, emotional problems, behavioral problems that they're trying to work out, a place to work those out and to yet remain in the community, remain having normal lives, and to avoid the stigma that is attached to institutions and the possible harm that can come from an otherwise heavy child being placed in an institution for lack of any alternatives. So this is an important piece in the state of Alaska's program for caring for children, but it is not an institution. What has the Department of Labor opined in this area so far? Is there anything we can glean from their rulings? Yes, Your Honor, there are a series of opinion letters which are cited in our brief which are essentially at homes for abandoned, neglected children and very similar to the Family Centered Services homes are not, institutions are not covered by the Fair Labor Standards Act. The distinction which I assume plaintiffs will draw is that we're not talking here strictly of abandoned or neglected children. We have children who have been diagnosed as having, already the language gets loaded, so I want to be careful here, but having conditions that require treatment, conditions that would be recorded today within DMS, is it four we're on now? For the moment, Your Honor. Heaven knows where we go next. So that although I understand the analogy to foster care, it's not quite the same because these aren't simply kids that have been abandoned or whose parents have been determined to be unfit. They're kids who have suffered as a result or for whatever reason now need a kind of treatment that the ordinary foster home wouldn't be in a position to provide. Why isn't that enough to make it cross the line into becoming care of people who have been determined to be mentally ill? A couple of points, Your Honor. First, the home is not where they receive treatment. The home is where they reside. The treatment, as the record shows, the children receiver is minimal, not necessarily at the home at all. The other point, too, is here we do, I think the proper phrase is they exhibit behaviors which are described in the DSM-IV. That is that these are children who have problems of various types. They can range from sexual abuse to abandonment to just simply dysfunctional family situations. It's a voluntary placement at these homes. It's not a... Voluntary on whose part? Generally the parents of the children. We'll ask that they be taken in. So there are some children in this program who are not, quote, mentally ill, unquote. They might have other behavior problems, but it's not mental illness. Exactly, Your Honor. They can have behavioral problems. They can have emotional problems. There are some substance abuse problems. They all, it sounds from what I can read from the record, have family problems that require them to have a safe and secure place to live. But we do not believe they qualify as mentally ill. What do we do with the fact that our notion of how to care for people who have problems has changed over the years and that when this statute was adopted, you either stayed at home or you were put in an institution or maybe locked up in the attic. But now that we have come to realize that being placed in a different kind of environment than an institution with bars can help mental illness, particularly children, what do we do with that fact when we're talking about it, looking at this statute, when those alternatives didn't exist? Well, I think what we look at is what was Congress looking at at the time, and they were looking at mental institutions, if you will, as the big house on the hill, like a hospital, and so they applied the law to that. We have a new model which is very, very different and very, very beneficial for the children, but it doesn't come within, in our view, the coverage of the old model. So in your view, this language refers to that kind of an institution? Yes, Your Honor. If I could reserve. Okay. Thank you. Thank you. Good morning, Your Honors. Thank you very much for coming here to Alaska. I'd like to introduce my clients, the Proberts and Grissoms in the middle. My clients are at work this morning. $3.13 an hour, that's what FCSA paid Loretta Probert to care for five seriously, emotionally disturbed children. How many hours a day goes into your computation to get $3? Fourteen hours a day. Seven days a week without relief, and it's reflected in the record, Your Honor. I think at the 300 pages are official time sheets from Mike Holmbaum excerpts of record, which FCSA, pursuant to its statutory duty, kept time records, and those are their records. They have their discovery time stamp on them. In addition to that, FCSA, and I'll get to the numbers here in a minute, but I think it's around page 70 of the excerpts, did their own computation post-litigation where they came up with similar amounts of hours, very similar amounts of hours. Is that sufficient? You've answered my question. Okay, thank you. All right. $3.13 an hour is what they wanted to pay. And let me start right here, Your Honors, because the bulk of the discussion with Mr. Moteman started in on salary, and houses, and cars, and this and that. This is an interlocutory appeal. The issue we have on appeal here is whether the FLSA applies under 203 R&S, and that's the only issue. Questions about hourly rate, which I cite in my brief, and initially in the litigation hourly rate was addressed just as that. Over time, as a defensive position during the course of litigation, they shifted their position over to salary. We had pending a motion to establish the hourly rate when the interlocutory appeal was granted. I say in my brief, and I would ask the court to please exercise caution over using the term salary versus hourly rate. Something else that's coming up now during the course of litigation is the use of three, four, and five kids in the home when I believe prior to the briefing in this case it had always been four or five. And, again, those are outside the purview of this court, and I expect if incidentally indicative of something like that is mentioned, it's going to come up in our latter briefing in the district court because they're very important issues to be raised there. What is your response to Mr. Monkman's comment that the value of this package for the parents is $125,000? The short, blunt answer is that's irrelevant, Your Honor. Why is it less relevant than your contention that you should look at this as 14 hours a day at $3 an hour on a portion of the total package? Because that's an issue to yet be litigated in the district court, for one. But the other answer, I think, is what they're diving out is there's a CFR that says, well, if your hours are difficult to determine, then you can make a special agreement that puts you in a different kind of compensation package. Not cited in these briefs, referred to in Kitching's, and cited in their brief to say the hours are difficult to determine is the Kitching's case, which is merely a Florida district court case. It has nothing to do with this case, factually, other than it happens to have similar types of issues. So the question we're here for in this interlocutory appeal is whether or not the FLSA applies. And as Judge O'Scanlon clearly pointed out, the question is the statutory language. The statutory language says if you're primarily engaged in the care of the sick, the malnourished, the aged, or the mentally defective, and those clients reside on the premises, you by definition come under the act. Well, looking at the definition as such, I assume that we're talking about R2A. Do I gather both sides agree to that? It's 203R and 203S in general, Your Honor, and they both contain the same language. But assuming we're talking about R2A, we're talking about activities in connection with the operation of a hospital. Is this the operation of a hospital? No, sir. Is it a school for mentally or physically handicapped? No, sir. Or an institution of higher education? No, sir. Well, then how can it be possibly an institution primarily engaged in the care of the sick on the premises of such institutions? That's exactly what it is. It's an institution caring for the sick. All institutions are not hospitals. But let me focus on the word care in particular. Look at the word care in connection with the last part of that one, who reside on the premises of such institutions. It seems to me that care must mean something other than reside, because if care simply meant reside, you wouldn't need that last part. And is there care being provided to these kids beyond the provision of a residence? And they're not being given mental health treatment within the home, are they? Yes, they are. By whom? By psychotherapists, and I believe we have that in the briefs. That's on the location of the home? Because the understanding I have from the family center is that the care is being given someplace else. First of all, as Judge Schroeder pointed out, the model is changing from the mansion on a hill with a vulture and a tree to a little community house. And as part of that change, not only is there a change in how the building is, but how services are delivered. And as explained in my brief, there's clinical treatment and there's behavioral treatment. And this is moving towards the behavioral model. And I've cited the materials that say mental health can be treated either clinically or behaviorally. So the mere fact, I mean, look at the name of the home, Therapeutic Family Home. Well, but the problem is we are treating people, we're providing treatment to people who wouldn't have been put in these institutions before. I mean, these are children, as I understand it, who are going to school. They're playing Little League. They're doing all kinds of things that are like normal children do. They're just no longer with their legal guardians or parents. They're in this house. And I'm having a little trouble seeing what the services that these people provide and the needs that these children have for 24-hour active supervision and care is similar to the people in the institutions that were in existence when the statute was passed. These are, they're not having to work in shifts like a nurse at the nursing station, these parents. That's what's bothering me. Let me try to cover your questions. Yeah, I mean, I think it's simple. Both sets, I don't want to get lost here. Okay, first of all, whether or not they ride the school bus is a non-secular. You can be mentally ill and ride a school bus, okay? Second of all, these children, I believe, are the kinds of children that would have gone to the old model institution. All these kids, or nearly all these kids, are on psychotropic medication. These kids went outside to lockdowns, to level 4s and level 5s. This is a level 3, okay? Then they essentially get them medded up, get them calmed down. Then they bring them home, and it's the bring-the-kids-home program they talk about in footnotes 6 and 7, and they can manage them in a less expensive, arguably kinder, general... It's a problem, it's kind of like a halfway house. Well, it's more than a halfway house. Although, thank you for mentioning a halfway house, because if you go to the FLH12Gs, guess what's one of the examples of something that comes under the statute? A halfway house, okay? So these are exactly the kinds of kids, I believe, that would have gone to institutions. But beyond that, they don't have to be. The statute says the sick, the mentally ill. Who do we give money to? Mentally ill, it appears to me that a lot of these children do not come within the classic, within the definition, the DSM-IV definition of mentally ill, because it includes such things as bedwetting, eating disorders, sexual or physical abuse, substance abuse. These are not classically mentally ill children. These are behavioral problem children. I think behavioral is a new way to address mentally ill. Just like, well, you're seriously emotionally disturbed, which is what these kids are, is the same definition as mentally ill, except it's for kids either under 21 or 18. It's the same definition. Didn't your own expert, Dr. Parker, opine that only depressive disorder, mood disorder, and post-traumatic stress disorder are generally considered to be mental illness? Very well may be the case. But let me come back to the examples you've given there. Mr. Reggietono, their executive director, said the disturbances that are among the disturbances are. He's no doubt listing the least serious, and given their approach to pre-pointing the DSM, the ones that are arguably attackable to say, oh, this isn't really a real problem. We don't decide whether the kids have a real problem. They decide if the kids have a real problem because they go see a psychiatrist or a psychologist, and the psychiatrist says, give these children psychotropic medication. I knew that. It was very serious. And my clients say all or nearly all, and even their executive director says, most of these children are on psychotropic medication. Your clients aren't administering the medication, are they? Yes. They're not prescribing medication. No, you have to have a psychiatrist to do that. And Mr. Reggietono said that. I'm going to try to move along. I'm running out of time. John, did I answer your questions? Well, let's still come back to the question of we've got this whole phrase to interpret. We don't simply look at the phrase sick at the age of the mentally ill or defective because we have institution, which has been a discussion of, and primarily engaged in the care of. And it seemed to me that care of must stand for something more than providing a residence because of the last part of the phrase. So what causes the home to be described as an institution primarily engaged in the care of? The short answer, because I'm short on time, is 12G15 from the FOH, which is appended to my brief, and it describes care. And if you're just a boarding house, you're not. But if you take care of the kids, then you are. And five SED teens are going to require lots of care. And by statute, this Alaska statute that addresses these homes says that they will provide care. I believe it's cited in my brief. Sorry, I'm fumbling here with my notes. In any event, this is an RCCF. Here we go. AS 4732-918 says an RCCF, Residential Child Care Facility, which this is licensed as, provides 24-hour care on a continuing basis. There's a whole statutory scheme and regulatory scheme that addresses this situation. FCSA frames the issue that you've got to be a mental institution. They read into the statute, they ask, are they being cared for when they're off to school? I gather these children of school age would spend a good part of the day, six, seven, eight hours a day at school. Sure, absolutely. Are they being given care at that point? They have parent-teacher conferences. They have medical appointments. We're not concerned about the teachers here. We're concerned about the home, the residence in which these five children live, and the parents, or at least their putative parents that are in that home. We're not concerned about what the teachers do. Their function is different, obviously. Does the parent care for the child when they're at school? I would say yes, but especially with this population, because they have lots more meetings. They've got to go to meetings about the kids. They've got to go to the doctor. They've got to get med refills. They've got to do all kinds of things with and for the kids. But that's really just a question of whether those are compensable hours, which, again, goes back to the district court. All we're talking about here is the applicability of the FLSA. If you go to the field operation handbook, it describes all these kinds of institutions. It describes a home for the emotionally disturbed, which they admit they are. They admit in their 2005 report, the children are mentally ill. But you say there's a 10th Circuit case. In a sentence, they dispose of it. They say home for the mentally defective, and then they go on to deal with immunity issues. Doerr v. Oddfellows, primarily engaged, they say, why are you there? Doerr v. Oddfellows has a statute that says you will care for the aged. Brand v. Harrison, I believe it was, Mississippi case, they had a statute that said it was a poorhouse. We have regulations that say this is for the seriously emotionally disturbed. Your time has expired. Thank you. Thank you. Just a few points. I think there is a very large distinction between care of children generally, as parents take care of children, and treatment of the mentally ill. The cases which have looked into similar financial situations have taken a deep look into whether or not the facilities are truly providing mental health treatment, similar to the classic mental institution for the care of the mentally ill. In this instance, we have house parents. They do not have licenses. They are not certified. They have some modest amount of training in dealing with difficult children and troubled children, but basically they are parents, and that's what they're doing is providing care for children. Just one point on the Judge O'Shaughnessy's question about the hours. Mr. Cobell has advanced that the projects were making $3.13 an hour. We have questioned that, and the record has an affidavit from the executive director, we went back through their timesheets. They were claiming that they were taking care of children when they were on vacation. They were claiming they were taking care of children when they were on respite, when people came into the house so they could leave and get a break. Essentially, we have- And when they're asleep. Yes. I think I'm out of time. You are out of time. Thank you. Thank you. The case just argued is submitted for decision. We'll hear the last case on the calendar for this morning, which is United States v. Oliver. Thank you. Thank you.
judges: Schroeder, O'scannlain, Clifton